Good morning, Your Honor. May it please the Court, Kathleen O'Sullivan for the Seattle Times, and I'd like to reserve five minutes to rebuttal. Okay, your clock counts down. We'll try to help you look out. Thank you. District Court's lengthy opinion rests on four clear mistakes on the law, and each of these errors matter. Three fundamental mistakes under CERCLA and one under the contract with Touchstone. The CERCLA errors include a misunderstanding of the relationship between Section 107A of CERCLA and 113F, the substantial compliance standard for consistency with the National Contingency Plan, and the standard for operator liability under CERCLA. Under the contract, the core mistake was the District Court simply eviscerated the rights that Seattle Times had under the contract to select the location for the contaminated soils for disposal. So first, on the 107A-113F distinction, the United States Supreme Court, in the Atlantic Research case, explained that these are different statutory provisions with different clearly distinct remedies available to parties in different circumstances. A 107A right is a right to cost recovery. It was the only claim available to Seattle Times. It is clearly distinct from a 113F contribution claim, and the difference matters for several reasons. First, 107A is a strict liability statute. Equity doesn't matter. That doesn't come in until the contribution claim under 113F, which brings me to the second reason it matters, and that's the burden of proof. Seattle Times, as the plaintiff on the 107A claim, had the burden of establishing the elements of that claim, but on the burden of proof, Leathercare had the burden. And Leathercare was not held to that burden, and the burden of proof matters. And the third reason why it really matters here and why this case is different is the orphan share issue. The orphan share issue is the only hook under which the district court allocated any share of the cost to Seattle Times. Seattle Times said that Leathercare and Troy were equally at fault and deserved the liability, but then on the orphan share issue assigned a percentage of that liability to Seattle Times. Has that been at fault? In many of these circular cases, the discharge of the substances that give rise to the litigation occurred many years ago when it was a perfectly lawful, permissible discharge, and it was before the environmental laws of the 70s were even passed into law. I don't really understand the emphasis on Seattle passively holding the contaminated property as opposed to running a dry cleaning shop there. You're absolutely right, Your Honor, that 107A is a strict liability statute. If those statutory elements are met and Leathercare stipulated to nearly all of them, including that it operated the facility, then there is presumptively joint and several liabilities. Everybody knows this. It's like if you buy an old gas station, you know that the property is going to subject you to claims. Well, Judge Zille's mistake here was in saying this was effectively a contribution suit. He threw all the claims together in one pot instead of first addressing the 107A strict liability element and only then turning to the equitable aspect on the contribution side. He just put them all together. He said so directly. He treated this as effectively a contribution suit. In counsel, under 107A, would Seattle Times have had to perform some remediation before 107A applied? What Seattle Times needed to do was to have incurred some costs that were necessary, and Seattle Times did incur some standard costs. Right. Seattle Times incurred nearly $5 million in costs to clean up the property, and so it did satisfy that standard, and that was... How were those costs incurred? Those costs were incurred pursuant to the contract Seattle Times had with Textham. So a contract that Seattle Times entered voluntarily was not forced by the EPA or a state environmental... So it was in the nature of reimbursement as opposed to Seattle Times in the first instance engaging in remediation and expending costs for that. Not in the sense of reimbursement like an insurance company, like the Chuck case that the parties... Well, an insurance company is more in the nature of indemnification, but I kind of see this agreement that Seattle Times had with Textham as being Textham will do the cleanup, and then Seattle Times will reimburse. Well, Seattle Times directly paid. It literally incurred, and we provided the dictionary definition of... It paid out of pocket nearly $5 million pursuant to the contract, and this letter stipulated those costs were necessary. Only on appeal do they question for the first time whether that was the case. Well, I'm just curious as to whether that meets the definition under 107A. Yes. They stipulated that the costs incurred were necessary, and by a plain meaning definition of incurred, they paid... They did so voluntarily. To turn to the next issue, the substantial compliance standard. This court in the Carson-Harvard 2 case explained that substantial compliance, not perfect consistency, is the standard, and this issue matters. One aspect of Seattle Times 107A claim that leather care disputes, and there was substantial compliance. This is a very detailed, more than 100-page feasibility study that analyzed multiple alternatives, three alternatives at great length. What was the different cost, effectiveness, implementability, and it selected the least costly alternative, and this plan was agreed to. So it was good enough for the state of Washington, but it wasn't good enough for the district court here. It said that, well, they only considered one alternative, and that's simply not true. You can look at that order, and there are three alternatives that were considered in great detail, and others considered at the screening stage, which is permitted regulations. I'm having trouble attaching your argument to the environmental remediation and indemnity agreement. Am I looking at the wrong agreement? That's the agreement. It just seems short, simple, straightforward, and clear. The purchaser has the right to remove and dispose of the soil at its own expense and seek reimbursement from the seller. That's what it says. The agreement is quite straightforward, Your Honor. It's just a few pages long, and one of the most straightforward aspects to quote from it was that the seller, that's The Seattle Times, shall have the right to select a disposal site for contaminated soil and move from the property. Okay, I missed that. Where's that sentence? I see where they have the right to have a consultant and a contractor to have reasonable access to the property, but where's the part about how they get to pick what to do with it? Right. I'm on ER 868, which is page 2. That's where I am. Right. Okay. If you look under two bullets, seller's remediation, that heading is folded. Yep. And then you go to the second full paragraph, beginning seller and purchaser contemplate. Yep. And it is five lines down there. I see what you're saying. Okay, thanks. Now I found it. Right. So that is an express right under the contract that the district court's judgment simply eviscerated. And the explanation for doing so is what follows. Two sentences later, the seller shall not unreasonably interfere with any ongoing development project. But it can't be unreasonable interference to stand on an express right in contract. And another supposed reason given for by touchstone as to why they didn't want Seattle Times to be able to stand on its right is that it would have led to construction delays. This is Judge Fletcher. Can I interrupt for just a minute? Yes. Have we just skipped to your second set of arguments that are based on the contract and moved away from the CERPA arguments? Yes, but I'm happy to go back. I'm happy to go back. I just want to make sure where we are. Because we started out with your 107 argument, 107, 113 argument. You've gone through the substantial compliance argument. And you skipped over the operator argument. But we're now on the contractual argument. Is that where we are? Yes. I was trying to address Judge Kleinfeld's question. That's okay. I just want to understand the sequence of the arguments and what's relevant to what. I got it. Okay. I do want to go back to operator liability because it is an important part of the appeal. Okay. Please. Okay. Well, I'll just jump to that right now. Again, when it comes to operator liability, first of all, there's the United States Supreme Court case on choice, the best food case. And this is an issue. The district court just got it wrong. And, again, it matters for several reasons. It matters because of the orphans here, again, in determining, well, Troy's not in the picture, who would be next to pay. It would make sense that leather care, as the actual polluter would be first, then Mr. Red. If the only men don't know that to be under cultivation, the Seattle Times, it also matters for selectability. Let me make sure I understand exactly what the operator argument is aimed at. Is it aimed at anything other than the decision that Mr. Red is not an operator? No, it is simply aimed at that. So the only question is whether Mr. Red is an operator. Exactly. I was simply trying to explain why it matters. Yeah, yeah. But it's only directed to Mr. Red. Okay. And the reason he is the operator, the Supreme Court said this is another, it's a plain language test. What does it mean to operate? It means to manage. It means to manage the operation of a facility. And if I could ask you to look at one page in the access record in addition to the contract, that's page 371. And Mr. Red admitted he had blood on the point that he was responsible for managing the pipes. He personally selected and installed the pipes. Well, I would have no trouble with your argument. It would seem quite compelling to me if we were reviewing a summary judgment. But since we're reviewing a trial verdict and findings by the judge, it's a lot harder because of the clear error standard. My problem with your argument on RIT is the judge could think, well, yeah, he dumped the stuff into the back of the truck and into the, I can't remember what you call them, side sewers or something like that. But he was not the guy who controlled the truck or the side sewers. His landlord did. And when we're reviewing for clear error, I wonder if that's enough to save the district court's conclusion on whether RIT should be treated as an operator. Your Honor, we have brought this as a de novo challenge to the meaning of the statute. I think even under a clear error standard, we would win. But the meaning of the word operate in a statute is a classic question of law. And if you look at the district court's reasoning, it said he had no control over the side sewers, that was his language, or over the dump truck. That cannot be squared with beholding that leather care itself is an operator. And leather care under that theory also had no control over the side sewers of the dump truck. And they shouldn't have even been considered an operator under the statute. So that's simply illogical. And it is inconsistent with the standard also from this court in a case that predates Best Foods. And then this court has reaffirmed that since Best Foods in the city of L.A. versus San Diego. The following question occurs to me, but it may be a detour. But ordinarily, when we're talking about operators in a case like this, we're talking about a company that doesn't. We don't ordinarily talk about the owner of the company or the CEO of the company. We hold the company responsible as an operator. Why are we going after Mr. Ritz? Independently of his company, what is a separate operator? Right. I'll give you an answer under the law and a practical answer. Under the law, again, this is a statutory construction issue. And person, CERCLA, is defined to include both corporations and individuals. So under CERCLA itself, it's permissible. But does that statute mean that any person operating within the structure of the corporation is liable in addition to the corporation itself? Absolutely not, Judge Fletcher. And we cited on a reply brief about six federal circuits from other circuits. We couldn't find one from this court that have grappled with this issue and have concluded, as a matter of law, an individual officer can be liable. But it depends what was his or her authority to control and personal involvement. So you have a case in the Fifth Circuit, Riverside, where you have kind of an absentee president who lives in New York, only at the plant three times a year. That person is not being held liable under CERCLA. But the persons who are actively engaged in the Fourth Circuit case, we cited Carolina transformer. In that instance, it is appropriate. And as a practical matter, as we're explaining why it matters, it matters for the work and share. It matters for the flexibility. My time is approaching below three minutes. So I would like to remain. This is a complicated enough case. Rather than cut you off here and deprive you of rebuttal time, I would like to hear you on the point that we got started on, which is the transportation issues, whether or not it goes to Wenatchee or to Roosevelt. Yes, absolutely. That's where the big money is. There's money all around in this case, Your Honor. But, yes, that was a critical part of the decision by the district court. And it was simply wrong. And it eviscerated this plain right the Seattle Times had to select the location. And you don't need to look at parole evidence to come to that conclusion. You had the right only to select the location. You did not have the right to select the means of transportation. And you also did not have the right unreasonable to interfere with the project undertaken by touchstone. So if I read that, it's all within a few sentences. I think it's a plausible reading of that contract that, yes, you can choose the location where it's going to go, but at the same time, you cannot unreasonably interfere with the project that is going forward. And if you were to choose Roosevelt and to insist upon it going by rail, that was going to slow things down. You could have chosen Roosevelt, and touchstone would have said, okay, fine, but I'm going to do it by truck. And it's going to cost you a lot of money. So instead of doing that, I'm going to cost you less money than sending it to Roosevelt by truck. I'm going to send it to Wenatchee by truck, and that's going to save you some money. So I don't understand what touchstone did wrong here. A few responses, Your Honor. What the district court did wrong fundamentally is the interpretation of incremental cost was inconsistent in the opinion. So incremental cost is defined as what it is. No, could you respond to the Roosevelt versus Wenatchee question? I'm not interested in incremental cost at this moment. Okay. I was trying to get to the construction fee issue. Touchstone asserts that it kind of presumes that Roosevelt versus Wenatchee, that the prices were essentially the same, or they were almost doing Seattle Times a favor, picking the least expensive option. And I have an invoice for you to look at. It starts at PSER 520. That's the touchstone. And if you look at page 524, you'll actually see side-by-side what was the cost to Roosevelt and what was the cost to Wenatchee. And there's a stark difference. So Seattle Times beef was not with them. I don't have that page in front of me. Give me just the page number again. I'll look at it later. What's the page number you're looking at? PSER 524. And what does it show? What it shows is that Roosevelt has $56.46, the unit rate, and Wenatchee. By truck or by train? It only gives one. It just simply lists the amount. But it doesn't tell me whether it's by truck or by train. It's not on there. If it's by truck or by train, it doesn't cost you very much. Well, they assert that, but I'm just showing you what's in our own invoice. But what you've told me so far doesn't tell me that they're wrong to say that it's cheaper to go by truck to Wenatchee than it is to go by truck to Roosevelt. I know the geography, and I can see that it would be cheaper to go by truck to Wenatchee. Roosevelt, a lot of little roads, way in the southeast corner right across from Arlington. That's a bad truck route to take. It's going to take you a long time. It's going to be expensive. They assert that, but what is in their invoice is simply the comparison of Roosevelt versus Wenatchee by these methods, with Wenatchee being far more expensive. And so, Seattle Times... Far more expensive than what? Than by train. It is more expensive than by train, but the question is, is it more expensive to go to Wenatchee by truck? Because you had the right to choose the location. You did not have the right to choose the method by which you could get to the location. So, if they're going to say, listen, I'm not going to hold up my schedule, and I will send it to the place you want, but the only way I can keep on schedule is to do it by truck, and it's going to cost you a lot of money. Yes, I hear this, and let me try to answer more artfully. The questions in their argument presume there was a neat package of three different options, but that's not what was in the invoice that was presented to Seattle Times. Okay. May I ask a final question on 107A? Counsel, when I asked you whether or not Seattle Times came within the statute, you didn't address the requirement that the response be consistent with the National Contingency Plan. And the district court found that it was not consistent with the National Contingency Plan. So, if we agree with the district court that the response was not consistent with the National Contingency Plan, would you agree then that 107A did not apply to Seattle Times? The answer is there's a reading of 107A that National Contingency Plan consistency only applies to damages. But we recognize this court in Carson Harbor, too, suggests it's an element of the Crenofacia case. So, our position is simply that there was substantial compliance. The plan was approved by the State Department of Ecology and considered multiple alternatives. Well, but what I asked you was, if we agree with the district court that the response did not comply with the National Contingency Plan, then would 107A not apply to Seattle Times? We have one more argument there, Your Honor, and that's the harmless error standard. What substantial compliance means is that immaterial deviations are not a barrier to liability. And so then you would need to ask, would some other conceivable alternative then actually use? But that would require us to reverse the district court's decision. So, if we went along with the district court decision and did not reverse it, then Seattle Times would not come within 107A. Is that correct? The answer is yes, assuming you find there was no substantial compliance and no harmless error, which is a question the district court didn't answer. So, the more appropriate issue would be to remand to ask the district court for that issue in the first instance. All right. Thank you. Okay. Now, we've taken you over time. This is a case of sufficient complexity that I think it is entirely understandable that we would have done so, and we will give you a chance to respond in rebuttal. Thank you so much. I think Leather Care is going first in response. Yes, Your Honor. Okay. Now, I'm sorry. I'm a little slow on this. Review the bedding for me in terms of how you're going to divide up the 20 minutes. Sure. My name is Kristen Meyer. I am going to address the CERCLA 107-113 issue. Yeah. How long do you anticipate taking? Five minutes at most. Five. Okay. Then what happens? And then my colleague, Ms. Flannery, will take 15 minutes to address the remaining issues as to Leather Care and Mr. Ridd. I see. So, you're spending five minutes on the 107-113 issue. All the rest of the issues will be addressed by your colleagues in the 15 minutes. Correct. If I take five minutes, I will do my best to take five. Okay. There we go. I've got it. When you're ready. Thank you, Your Honor. Again, my name is Kristen Meyer, representing Leather Care and Mr. Ridd, addressing the 107-113 claim that Ms. O'Sullivan has just been addressing. Now, as a threshold issue, the district court got it right at summary judgment in denying a 107-80 judgment because the Seattle Times didn't meet all of the elements of the claim. I couldn't hear you. What did he say? The volume's a little low. Okay. Is this better? Is this better? Okay. I'll just talk very loud. Thank you, Your Honor. Seattle Times did not meet all of the elements of a 107-A claim in order to obtain summary judgment. It concedes that one of the elements of a prima facie 107-A claim is consistency with the NCP, which they reserve for trial. So certainly at the summary judgment stage, it was appropriate for the district court to deny that summary judgment. Now, even if Seattle Times had obtained, either at summary judgment or even at trial, a judgment on the 107-A claim, the fact that Leather Care asserted a 113-F counterclaim, and the district court found that Seattle Times was a potentially responsible party because they had stipulated to the elements of that, then 113-F controls, and as the Fourth Circuit has described it, it negates any 107-A claim or any judgment under 107 because at that point, the district court is required to equitably allocate all of the response costs separately among all of the potentially responsible parties. So that even if there was a judgment under 107-A, and then the court allocates under 113, the allocation is what rules and is the judgment in the case. So what do you do with the question raised by the Seattle Times saying, well, yes, that's all true, but it really makes a difference whether we're proceeding under 107 or under 113 because the burden of proof changes. What do you do with that argument? Well, the burden of proof in this case, Leather Care had a burden under MOTCA, and it had the same burden under a surplus. And so when the court allocated equitably in its order, it said, I would have allocated the same way under surplus, and I would have allocated the same way under MOTCA. Leather Care asserted a MOTCA claim and a surplus claim, and it had the same burden to do so. Actually, each party asserted a claim under MOTCA. There is no indication in the district court's order that it had only looked at its allocation under Seattle Times' burden under MOTCA. Is the clock running? I'm sorry? The clock is running. You're right. Oh. Thank you. I missed that. I'll still try to be brief and not take up this five minutes. Say what you need to say. Okay. So the burden here is the court got it right. The court didn't indicate that it was only looking at this allocation under a particular burden. And regardless of the burden, the evidence is sufficient to support the court's conclusion both that Troy used PCE and that Troy was immune from suits, that it was defunct, and therefore orphaned share. And we don't even need to get to any of this, of course, unless this court resurrects the surplus claim. Let me make sure I understand the argument you just made with respect to allocation under state law. I want to make sure I understand the argument. You can correct me if I'm wrong. You're saying that even if the district judge made a mistake and he should have said that there was a good claim for under CERCLA under 107 and shifted the burden of proof to the other side here, that he actually did so when he was reviewing the state law claim so we know what he was going to do. Is that the argument? Correct. So even if there is a 107 mistake, you say it's harmless because we know what he was going to do when the burden of proof shifts. Correct, because the burden already has shifted under the state law. Or at least leather care had a burden under the state law just as it does under the CERCLA counterclaim. Okay, I get the argument. And of course, this is all theoretical unless this court resurrects the CERCLA claim, that's the only time at which the burden would be relevant. And so at that point, I would like to hand this over to my colleague unless any of you have any further questions on the 107-113 issue. I think not. So let's hear from your colleague. Good morning, Your Honor. May I please support Your Honors Joe Flannery for leather care and Mr. Ritt. Are you able to hear me at this volume? Yes, I can. I'm going to address the consistency with NPP, Ritt's personal liability, and our prevailing party cross-appeals. And we're going to stand on our bracing for the attorney's appeal. I need your help on something that's bothering me so I can put it behind me and listen to the rest of your argument. I'm wondering why we don't have to reverse on attorney's fees so that the Seattle Times can recover attorney's fees from leather care. It seems like they're a prevailing party against leather care because they've got a money judgment against leather care. What am I missing there? So as to the prevailing party, if you were going to agree with Seattle Times' argument, it would require you to ignore two important things at the same time. It would require this court to ignore the rest of the judgment, all except for paragraph 8. And it would require this court to ignore an entire body of Washington State prevailing party law. And that prevailing party law, this is important because basically Seattle Times really concedes this appeal at page 4 and 5 of their reply brief. You'll see that they cite extensively from the Douglas v. Shamrock caving case. And Douglas cites extensively from Washington prevailing party case law. Hold on, I'm having trouble following the answer. You're telling me there's a whole lot of law that explains why the Times is not a prevailing party against leather care despite winning a money judgment against them. But you haven't told me what the law says. Okay, so in Washington, if you do not wholly prevail over the other party, and we know that Seattle Times did not wholly prevail over leather care, because we look at the judgment at paragraph 3, 6, and 10, we know they didn't fully prevail. Then we go to the next step and we say, did leather care receive some judgment in its favor? The answer is yes. Again, look at the judgment at paragraph 3, 6, and 10. So leather care is a party that has an affirmative judgment rendered in its favor. Seattle Times did not wholly prevail over leather care. And that's plain on the face of the judgment. That triggers the next inquiry. And under RIF, which is also cited with approval in the Douglas case that the Times relies on, the next inquiry that's required then is a weighing up of the wins and losses. If neither party wholly prevailed over the other, then this weighing up process must be done. And the court proceeded to do exactly that and engaged in the weighing up of the wins and losses of each party. And even if you take out the, well, Seattle Times didn't prevail over Mr. Rich, take that out, you still have the weighing up of the wins and the losses. And the court concluded that neither party substantially prevailed over the other. And under Hertz v. Reedy, Enos v. Ring, Wesch v. Martin, the 2019 Western District Court case that Touchstone cited, that was the Porter-Ridgefield case, Washington law expressly authorizes the court to reach that conclusion. Neither party wholly prevailed over the other, neither is a prevailing party. Did that fit you? How did Leather Care prevail over the Seattle Times? So Seattle Times brought its own independent remedial action claim, and Leather Care completely defeated that claim. That's in the judgment at paragraph 3. That claim was completely dismissed. Seattle Times was seeking joint and federal liability. That's what I thought. You're talking about theories for obtaining relief, kind of like in a simple case where the plaintiff says you owe me the money because it was negligence and also because you're strictly liable. And the jury concludes or the judge concludes there's no strict liability here, but they owe the money for ordinary negligence. That's a win, even though one of the theories for relief was defeated. And I think you're saying that Leather Care won in part because some of the theories for relief at the time were defeated. Your Honor, it's different than that. It was two separate claims. Seattle Times had a claim for a particular portion of money that was Touchstone's cleanup cost. And Seattle Times would say, I paid Touchstone in my contract. I would like to be indemnified for those costs that were Touchstone's. Separately, Seattle Times said, and I have my own MASCA claim for my independent remedial action, and I want costs from you for that. And Leather Care completely defeated that. Moreover, Seattle Times was actually pursuing Leather Care for 100% liability. They told the court, hey, you know, maybe give us 3% only if you have to, but they were really pursuing Leather Care for 100%. And the district court was very mindful of that. That came up over and over and over in the case. And it really drove the litigation. And they did not prevail on that. And then when it came to Leather Care's counterclaim and asking for a fair allocation of future costs, which has a monetary value, we prevailed, Leather Care prevailed. Seattle Times ended up with a greater share even. So Leather Care did receive some judgment in its favor, and that's the Washington State case law language. And Leather Care received an affirmative judgment in its favor. Thank you. I want to just touch on the NCP and consistency with the NCP. The framework for the feasibility study that Touchstone did was driven by Touchstone's real estate redevelopment plan. Touchstone was not trying to be consistent with the NCP. There are at least three substantive requirements that were completely left out of Touchstone's plan, and Seattle Times is mistaken in the material it presents to this court. The detailed analysis of viable alternative remedies was skipped altogether. Consideration of costs and alternate remedies was skipped altogether. Monitored natural attenuation for groundwater was skipped altogether. The relevant regulation is 40 CFR 300-430, and the prescreening requirement discussed by Seattle Times has been subsection E-1. Before, the required detailed analysis set forth in subsection E-9, which is missing altogether. They're not the same thing. And if you look at the draft feasibility study at section 8.1, and this is ER 843 and 844 in the record, it plainly lists the remedial technologies that survive subsection E-1 prescreening, and both soil vapor extraction and monitored natural attenuation are listed. Table 3 of the feasibility study, which is LNCR 609, shows the results of the prescreening. Both SBE and monitored natural attenuation survived the prescreening. They were— I have a question for you with respect to what standard the district judge applied to determine whether or not the plan complied. Did the district judge say that the test was substantial compliance? Yes, Your Honor. Substantial compliance— Because I read the opinion, I didn't see that it was substantial with respect to district— Yes, and even if he didn't use that word, the standard is— No, I'm asking did he or did he not? You're saying he did because I didn't see it. I don't know if he used that word. Well, what he looked at was the fact that the three important elements at a minimum were missing, and this is the—it's not an immaterial or insubstantial deviation from the plan. This criteria is the heart of the regulation that is applied to make sure that the remedy that's selected is efficient and cost-effective. So skipping those steps because you've pre-selected your remedy defeats the whole purpose of the regulation. That's why— Counsel, is it your position that even if the substantial compliance standards were applied that it was not met by Seattle Times? Yes. Yes, these important steps were skipped altogether. They are neither immaterial nor insubstantial. If you look at the cost evaluation that was done—and here again, Seattle Times is just mistaken. Look at the record at LNCR 611 through 614. This is where the cost evaluation is done, and the court will see that only excavation and only active groundwater treatment were considered for cost. Skipping that evaluation altogether is neither immaterial nor insubstantial. It defeats the whole purpose of the regulatory scheme. And I need to push on to Mr. Ritt and the personal liability issue, if I may. Please. We've had some discussion about how CERCLA is a strict liability standard, and therefore it is essential for Seattle Times to use its burden of proof on each essential element under the statute. And what matters, the relevant inquiry, is not whether Mr. Ritt is a former operator of just anything on any part of the property, but whether he personally operated the facility where the waste was disposed of, whether he personally operated the facility that actually released the hazardous substance. Help me on something there. The Anchorage Times, or I mean Seattle Times, argued that you can't very well say that Ritt wasn't the operator, his landlord was, without also saying Leathercare wasn't the operator, the landlord was. So it's inconsistent, logically inconsistent, to let Ritt off the hook and keep Leathercare on. It's got to be either both on the hook or both off the hook. What is the matter with that argument? Okay. First, what's important is, what is the facility that is at issue? Where, who's operating what facility? So Seattle Times is trying to just skip over the analysis. The truck and the side sewers, right? Right. Okay, so why didn't, neither of them operated the truck and the side sewers. So if you take that to be the facility, as opposed to taking the real estate where the dry cleaner operated as the facility, then Leathercare would have to be tolerated, wouldn't it? So here, no.  First, Leathercare is free to stipulate it to liability. In trying to run away from this and stipulate it to liability early on, trying to streamline the case, which usually results in a settlement, that didn't happen here. But Leathercare was also in a contractual relationship with Troy. And it had the non-exclusive right to use Troy's facilities. And there are other ways to find liability under the statute. And those don't apply to Mr. Ritt. And here, Seattle Times is seeking Mr. Ritt's personal liability, separate and apart from the corporation. And the case law on operator liability clearly shows that personal involvement is required in the operation of the facility that actually, where the waste was deposited, or the facility that actually released the material. Because that's part of the definition of a PRP or a PLP. And that is where Seattle Times is missing a vote. It was obligated to prove that Mr. Ritt personally operated the facility at which the hazardous material was disposed. That's the definition. Counsel, is that the definition? I thought it also included the operator of the facility that generated the polluting substance that was ultimately disposed of. So this is what I was saying. There are other definitions under CERCLA where liability can be found. And you were concerned about Leathercare. Those were not an issue in this case. And they were not litigated in this case as Mr. Ritt. So what's at issue as Mr. Ritt is did he personally operate the particular facility at which the material was disposed? Was that the ground on which the district court found that Mr. Ritt was not an operator? Or did the district court do it on the ground that, well, wait a minute, it was the landlord's responsibility with respect to the dump truck and the side sewers? So those two things are related. And you're right. The district court specifically found that the facility is at issue. And this is important. The facility is at issue for the Troy Laundry garbage truck and the Troy Laundry side sewers. Those are findings of fact that are unchallenged on appeal. And further, the court found, this is at ER 74 and 75, that Mr. Ritt had no operational control over the dump truck or the side sewers. That's also a finding of fact which is unchallenged on appeal. But it strikes me as a matter of law that that's a vulnerable holding because Mr. Ritt clearly was in charge of the company that was generating the waste. So in that sense, he clearly is an operator. Now, the entity that dealt with what happened to the waste after he generated it is a different entity. But his company generated the waste. This is not a generator liability case. It's not a generator case. It's not an arranger case. This is only looking at whether Mr. Ritt can be held personally liable as a former operator. Okay. And that's the answer. And liable for what? Liable for creating the toxic waste or liable for putting it in the wrong place? Well, the question is, can he be held personally liable for the cleanup spot or the waste that leaked out of the dump truck, over which he had no control, or the waste that leaked out of Troy's side sewer, over which he had no control? And here's what's important. We start with the corporate shield. In order to set aside the perception of the corporate shield, to find an individual corporate officer personally liable, case law discusses the type of personal involvement that's required. The person needs to be heavily involved, intimately participate in the operation of the facility at issue, personally involved in wrongful conduct. There's no finding of wrongful conduct. That's not your problem. That's not the problem. He's the boss. It sounds like what you need is to define facility so that it just means the pickup truck and the side sewers and not the real estate where the dry cleaner operated. And, Your Honor, that is what the district court did. Counsel, is that consistent with the Washington Supreme Court decision in Pope? Yes. In fact, Pope makes a point to say, under MONCA, our state statute, the focus when we look at operator liability isn't looking at any control. It's looking at the word control. And it's very particular to say, to be an operator, you must have operational control of the facility at issue. And here, again, the district court found, as you were saying, Your Honor, that the dump truck, the side sewers, the prime sewers, the toilet sewers were some of the- Counsel, but the language in Pope is much broader than you articulated. It says the operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste. Yes. So, it's hard for me to see how you can limit the term just to the dump truck under that broad language in Pope. Your Honor, I want to make sure that this panel doesn't make the same mistake that Seattle Times is making. So, looking at just that language about operational control, remember that Seattle Times has a burden to prove that Mr. Ritz was a PRP or a PLP. Did they prove each particular element of those definitions? And that is where, when we get back up to what Seattle Times missed, what it skipped, what it failed to prove, is that the operational control, and that language is in Pope, must be exerted over the facility at which the waste was disposed. The facility that released the hazardous waste. That is why Mr. Ritz is not personally liable and cannot be held personally liable in this case. Seattle Times did not need this burden to prove PLP or PRP. Did Mr. Ritz operate something, the PPE equipment inside Leather Care's facility? Maybe. That's not the correct analysis in this particular case. In the other liability cases that are cited, and this is important to release the court's mind, these other operator cases where individual corporate officers were found personally liable or might have been, they were personally and heavily, intimately involved with the particular facility that gave rise to the release. The particular facility where the waste was disposed of. They supervised employees that cut open transformers and let the oil leak right onto their facility. That kind of involvement. Okay. We are well over time. Would you want to spend one minute on that last point, which is the question as to whether it goes to Roosevelt or to Wenatchee? That's not our issue. We take no issue at all on the contract. So whose issue is that? I thought you were going to talk about that. Nobody going to talk about that? Touchdown will come after us. Oh, there are more people yet. Okay. Yes, Your Honor. Thank you. I thought we were finished. Okay. It pleases the court, Jeremy Larson, on behalf of Touchdown. This morning I'm going to address two of the principal topics of the multiple appeals before this court that relate to Touchdown. That is the Seattle Times' assignments of error on the contract award made by the district court. And secondly... Counselor, could you speak up a little? I'm having some difficulty hearing you. Thank you. I'm going to address two issues. The first is the contract award and the assignments of error made by the Seattle Times on the contract award. The second is the district court's denial of pre-judgment interest on that same contract award. My colleague, Mr. Ken Weatherman, has laid a deal with the issues of Mr. Ritt's status as a commandant of the party. And the issue... Could you address that and get it off my mind? It seems to me that Touchdown sued Ritt. Ritt beat him. He was held not to be liable for any money to Touchdown. So under Washington law, he's entitled to attorney's fees against Touchdown. It seems pretty straightforward. I don't quite understand why he's not a prevailing party against Touchdown. Because he also brought claims against Touchdown that he did not prevail on. He and Weatherman here sued Touchdown first. Touchdown counterclaimed. Neither party actively pursued claims against each other, which is what the court found. And both sides prevailed against each other in the sense that neither got affirmative relief. Alternatively, you could look at it as both sides failed to prevail because, again, neither side got affirmative relief on the claims of the other. Turning it from there... You need total relief. I mean, if you sue for $100,000 and you win 50, then unless there was an offer of judgment that changes things, you're a prevailing party to the extent of 50. Well, both sides are equally prevailing parties, Your Honor. Neither side got any affirmative relief against the other. That's limited relief. None. So Rick and I get eight. They have to be a prevailing party, too. If A sues B for $100,000 and the jury says B doesn't know A is sent, B wins, and B is entitled under Washington law to attorney's fees. Well, the district court recognized that both Leather Care and Touchstone equally prevailed on their respective claims. That is, neither got affirmative relief against the other. And so both of them were equally prevailing parties. In that instance, the district court just decided to award neither side attorney's fees and didn't declare either one a prevailing party over the other. Now, there were instances that the court addressed less than full recovery on claims. Just remind me, what were Rick's claims against Touchstone? Rick's claims against Touchstone were for equitable apportionment under MOTCA. And Touchstone's counterclaim back was for the similar equitable apportionment to the extent that Rick established a basis. Neither side established a basis against the other. Neither side was a prevailing party. Thank you. Thank you, Miller. Turning to the Lane claim and Seattle Times' assignments error, Seattle Times makes three assignments error to the district court's findings on the ERIA. The first has to do with truck transports. We've lost Judge Fletcher. Okay, I think I'm back in business now. Hello, is anybody on the call? We're here. Okay, this is Judge Fletcher. I'm now on by telephone because the video connection seems to have failed. So, we were talking about attorney's fees. Are we still on attorney's fees? We didn't do anything once you disappeared, so we're right where we were. Okay, well, let's keep going. Now I do not see the time clock. So, somebody may want to help me with the time clock because I'm just totally on the phone. I don't have any video at all. All right, we will. Okay. So, please continue, counsel. Thank you. It's half o'clock. Thank you. Jeremy Larson again on behalf of Touchstone. I'd now like to turn to the main claim and Seattle Times' assignments of error to the district court's award of contract costs under the ERIA. Amounts due and owing to Touchstone for the transportation and disposal of contaminated soil. Amounts due and owing from August 30th of 2015. Now, Seattle Times makes three assignments of error with regards to that claim. The first has to do with certain truck transports in Wenatchee. The second has to do with certain sampling that occurred in conjunction with the requirements of the contained outlet or required by the Department of Ecology. And the third has to do with that increment in sales tax that Touchstone was required to incur as a result of having to dispose of contaminated soils. Turning to the truck transports in Wenatchee issue. The simple answer to that is Touchstone undertook truck transportation in Wenatchee because it was much cheaper than truck transport down to Roosevelt. Testimony of Shannon Testa at TSR 35 is part of the substantial evidence that the court relied on in making that determination. Nothing in the ERIA gets Seattle Times to determine the mode of transportation. Nothing in the ERIA requires only rail transportation. And certainly, Touchstone had the right to transport by truck if needed. Council? Yes. What's your response to opposing counsel's observation that it still had the authority to determine the location that was not adhered to? Counsel is right. Seattle Times had the right to select a designated location. But in so doing, and before the excavation began, it told Touchstone not only that it was connected to Roosevelt, but that Touchstone had the availability to, or be, via another feasible option that was less expensive than option A, Roosevelt. Point to the contract. Point to the language. So this is in TSER 76. It's a letter from... Is that part of the contract? It's not part of the contract itself. It's part of the designation that Seattle Times made to Touchstone with regard to where the facility was. So in the contract, Seattle Times didn't designate a facility. After the contract was signed, and before excavation began, Seattle Times designated a facility, but said in that very designation, that's TSER 766, or a less expensive viable option. And that's exactly what Touchstone did. And Washington law recognizes this, even if it wasn't in the contract, under the Scott-Taper decision that says where a method of performance is not available, an alternative that does not prejudice the other party is acceptable. And indeed, here, not only was it not prejudicial to Seattle Times, it actually saved them incremental costs that would otherwise have been more because of the cost to Roosevelt versus Bonacci. So there was substantial evidence that supports the district court's determination that this properly dealt with the incremental costs. Turning to the issue of sampling, there was certain sampling that had to be done to ensure the proper disposal of the contaminated soils. This was required by the Washington Department of Ecology's contained in agreement. Excuse me, contained agreement. That required, among other things, this is at TSER 768L, that recordkeeping be kept of the precise amounts of contaminated soil that were shipped so that it could be logged and tracked in accordance with the ecology's determinations. So in order to properly dispose of the contaminated soils, this recordkeeping had to happen. And the district court found that this recordkeeping was part of the necessary cost of properly transporting and disposing of the contaminated soils. Again, substantial evidence that supports the district court's finding in that regard. Finally, with regard to sales tax, Touchdown only asked for, and the district court only awarded, that incremental increase on sales tax over the cost of the entire project that was attributable to the necessary transportation of contaminated soils and disposal of those contaminated soils. Again, substantial evidence that supports the district court's finding that this was part of the necessary cost. Counsel, when you refer to SER 766, which appeal record is that in? So that's in the main appeal, Your Honor. Oh, I beg your pardon. Give me the number, the appeal case number. That would be... It is case 18-35-773, Your Honor. Okay, thank you. I might have misspoke. That might be the pre-judgment appeal. My apologies. Turning to the issue of pre-judgment interest, on that same contract award, the district court made an error of Washington law when it decided, as a matter of law, that Touchdown was not entitled to pre-judgment interest on a contract. Now, the way the court added up the contract claim and awarded it to Touchdown was to take the very same invoices that Touchdown submitted to the Seattle Times, determine whether there was evidentiary support for them, and whether they fell within the definition of incremental cost based on its fact-finding endeavor, and then, when it was done, add up those costs and determine what the cost recovery was for Touchdown. The quintessential case of a liquidated cost recovery in Washington. The district court erred, as a matter of law, in finding these fundamental errors under Washington law. And, therefore, the court properly refused that decision to Novo for this court's decision in public products and Santa Barbara. Also, the Washington decision of McConnell makes it clear that where a court decides, as a matter of law, Touchdown liquidated, that's refused Novo. Now, here the court made two fundamental errors of Washington law. The first was the court simply disapplied the car wash versus confidence case. That was a case that did not involve a contract for cost recovery. That was a case that had no cost recovery contract to look at, no way to add up the costs. Instead, the court was left to a MOTCA analysis, which is, of course, unliquidated, and determine the parties' respective liabilities on that basis. Here, there was a contract. Indeed, the only claim Touchdown brought against the Seattle Times was on a contract for cost recovery. Confidence simply does not apply in the facts of this case. The court compounded its error when it decided, as a matter of law, the case was too complex for the claims to be liquidated. There's no Washington authority to support this. Indeed, Washington Supreme Court rejected that argument in the Warehouse case, where it said the complexity of a case doesn't render a claim unliquidated. Indeed, even the presence of unliquidated claims doesn't render unliquidated claims unliquidated. You can have a claim in multiple parts, some of which is liquidated, which you're entitled to under Washington substantive law to prejudge an interest on, and other claims that are not. In this case, we only have one claim, one liquidated claim for contract recovery. So, we would ask that this court reverse the trial court and direct entry of judgment on the prejudged interest. It was due and owing to the last invoice, August 30, 2015, September 30, 2015, in the amount of $1,046,472. I have a little feedback. Did the court hear my last point? I have a question about your citation to SCR 766. Is that the letter dated July 29, 2014? Yes, it starts 765. Correct. Point me to the language that you are referencing that gives Touchstone the ability to go to a different site. So, in paragraph 2, counsel says, it designates Republic Services disposed of at the Roosevelt Regional Subtitle D landfill. Now, it also purports to cite by rail, but of course, Seattle Times doesn't have that right under the RIA. And then it says, or B, another feasible option that is less expensive than Option A, the Roosevelt Regional Subtitle D landfill, which is exactly what Touchstone did when it sent the contaminated waste to Wenatchee when rail cars were not available to go to Roosevelt. Thank you, Your Honor. If there's no further questions, I'll turn the matter over to Mr. Leatherman at this point. Thank you. Thank you, Mr. Larson. May it please the court, my name is Ken Leatherman, co-counsel for Touchstone in this matter. I was planning to address the issue of prevailing party status between Steve and Rick individually at Touchstone. However, Mr. Larson very effectively answered those questions when posed by Judge Feinfeld. At this time, if there are no further questions, I will address only the last argument on Touchstone's list, which is the issue of attorney fees. Seattle Times has appealed the award of attorney fees against Seattle Times under the contract. There was no appeal by Leathercare of the attorney fees awarded to Touchstone under MONCA. There are two primary causes of Seattle Times' position in this matter. First, Seattle Times argues that this is a MONCA-driven case, but it is not. The driver of Touchstone's claims against Seattle Times was the contract. And in the final ruling and findings of fact and proceedings of law from the court, the court clearly acknowledged that there were two separate claims, there were two separate judgments, there were two separate prevailing party determinations in Touchstone's favor, and two separate fee awards, and the one given to Touchstone from Seattle Times was solely under the contract. The second flaw in Seattle Times' argument is that they set forth a burdensome and overly rigid process that is not required or mandated by the Washington law. Touchstone followed the Lone Star process and provided ample documentation and information about its rates, about the work that was done, and made the best reasonable effort to segregate those fees wherever possible. The court followed by making very detailed findings as to which attorney fees were recoverable and which were not. The court made several hundred thousand dollars of reductions, which we have not appealed, as those reductions were within the court's wide discretion. And the court very clearly documented this flaw with regard to the separate prevailing party determinations, first in MONCA and under the contract. The court's analysis and decision with regard to the fee award are entirely within the district court's wide discretion, and Seattle Times has presented nothing in its briefing that merits a remand to the district court. As such, we ask that the court uphold the court's finding as to attorney fees. At this time, Your Honor, we have nothing further unless there are further questions. Not for me. We appreciate the court's time. Thank you again. Are you there, Judge Fletcher? I think we lost Judge Fletcher again. Sam? Yes, Judge. I'll try giving him a call. All right. There he is. Oh, can you see me now? Yes, you're back. You can hear me. Okay, because I've been hearing you for a while. Okay. What was the last thing that you heard, Judge Fletcher? So you heard all of the last arguments? I heard all of the last arguments. I heard some of it by telephone, and then I heard it more when I got back on screen. Okay. So I'm back in business, at least for the time being. Okay. So, Mrs. Sullivan, you've got rebuttal. Let's put three minutes on the clock and see what happens. Thank you so much. We try to make four points on rebuttal. First on harmless error. This is very important. Essentially, Leathercare argues no harm, no foul. You know, we know what the district court would do. No, we don't. We would be speculating how the district court would have resolved the 113F counterclaim on which Leathercare bore the burden. And we know that because the only time the district court used the word burden in its opinion was putting the burden on Seattle Times or on Touchstone. What do we make of the argument, though, that in allocating under Washington law, the district judge did the same burden as he should have done, in your view, with respect to CERCLA, and under that burden of proof with respect to Washington law, he made the findings that he would have made under CERCLA. How do we respond to that argument? Yes, how do we respond to that? Again, he put the burden on the Seattle Times. And so we don't know how it would come out on — we certainly don't know how it would come out on the CERCLA claim, but not even on the MOCCA claim. If the burden under the law was on Leathercare, the court should have proceeded in an orderly fashion, first ruling on the CERCLA, the 107F claim, then 113F, then on the state law claim. So we just would be speculating, especially on this orphan chair issue. It's very clear that the court was putting the burden on the Seattle Times to determine that there was an orphan chair that Troy's successors had no access, et cetera. And the Fourth Circuit has made clear in many of their enterprises, if the burden of proof is improperly allocated, you send it back for the district court to determine in the first instance, and not for the court to give the gift. Second point on operator liability, what Leathercare — excuse me — and RIT are defining as facility is just entirely at odds with the text of CERCLA, which defines facility broadly, and their own stipulation. Leathercare stipulated there was a release from a facility to say, so only the facility with somehow the sewers and the dump truck is not consistent with their own stipulation, or with CERCLA itself, or with the state ecology agreed order, which considered the entire property to be a facility. And if you have any questions about if you can escape liability, if you dump PCE down someone else's drain, I urge the court to look at a district court case we cited, Lincoln Properties, from Judge Levy in the Eastern District of California. Third, to untouch them, to try to go back to these contract issues. The touchstone has been very clear. The only reason they wanted to go to a different location was to avoid construction delays, and that is carved out of the definition of incremental costs. And Judge Levy recognized that, and not giving them a premium for Saturday delivery. And essentially the question is asking here, is the delivery — excuse me — a premium for delivering to their location of choice? So what's your response to opposing counsel's reliance on the letter designating the facility as giving the option to take a less expensive route? A couple responses there. First, of course, it's plural evidence, and the district court said he didn't consider any extrinsic evidence. He was relying on the contract itself. So that argument is inconsistent with the district court's own reasoning. And secondly, it goes back to the discussion I had with Judge Fletcher earlier about which was actually cheaper. Their assertion is that it was cheaper to go to Wenatchee, but that's not what the invoices to Seattle Times demonstrates. If there are no further questions from the panel, we'd ask that you reverse and remand with instructions to the district court to correct the errors. Okay. Thank you. Thank all sides for their arguments. And let me make sure I get the name of the case correctly. Seattle Times v. Leather Care et al. Now submitted for decision. Thank you very much, counsel.
judges: Kleinfeld, W. Fletcher, Rawlinson